# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5772 | **DATE** | 3/23/2004 |
| **CASE TITLE** | Stacey Stern vs. Cintas Corporation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____.

(3)  ☐  Answer brief to motion due_____.  Reply to answer brief due_____.

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____.

(5)  ■  Status hearing set for 5/18/2004 at 9:00 A.M..

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐  Trial[set for/re-set for] on _____ at _____.

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10)  ■  [Other docket entry]    Enter Memorandum Opinion and Order.  Cintas's Motion for Summary Judgment (Doc. No. 16-1) is granted as to Plaintiff's retaliation claim and denied as to Plaintiff's sex and pregnancy discrimination claims.  Referral to Magistrate Judge Denlow for settlement conference.

(11)  ■  [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **3** | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | MAR 2 4 2004 | |
| | Notified counsel by telephone. | | date docketed | **30** |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 3/23/2004 | |
| ✓ | Copy to judge/magistrate judge. | | date mailed notice | |
| ETV | courtroom deputy's initials | | ETV | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

STACEY STERN,                          )
                                       )
                Plaintiff,             )
                                       )
        v.                             )        No. 02 C 5772
                                       )
CINTAS CORPORATION,                    )        Judge Rebecca R. Pallmeyer
                                       )
                Defendant.             )

## MEMORANDUM OPINION AND ORDER

From 1990 until November 2001, Plaintiff Stacey Stern ("Stern") was employed by
Defendant Cintas Corporation ("Cintas"), a national provider of corporate identity uniforms, first in
a sales position and later in a supervisory role. She filed this action in August 2002, alleging
discrimination because of sex and pregnancy and retaliation in violation of Title VII of the Civil
Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Civil Rights Act of 1991, 42
U.S.C. § 1981a. Specifically, Stern alleges that Cintas failed to reassign her to the more secure
non-supervisory position she held initially, failed to make her eligible for a bonus, gradually
removed her job responsibilities, and ultimately terminated her employment based on her gender
and pregnancy and in retaliation for her complaints of discrimination to Cintas, to the U.S. Equal
Employment Opportunity Commission ("EEOC"), and to the Illinois Department of Human Rights
("IDHR"). Cintas now moves for summary judgment. For the reasons stated below, Cintas's
motion is granted in part and denied in part.

## FACTUAL BACKGROUND

I.      **Plaintiff's Employment History Prior to Alleged Discrimination**

In October 1990, Plaintiff Stern began working for Uniforms to You ("UTY") as a National

30

Account Executive[1] ("NAE") in UTY's National Account[2] Sales Division (the "NAS Division"). (Def.'s 56.1[3] ¶ 3.) In this position, Plaintiff was responsible for sales to certain national accounts; she also had some responsibility for managing National Sales and Service Coordinators ("NSSCs"), i.e., sales support personnel responsible for maintaining existing accounts but having no sales responsibilities. (Stern Dep., at 43.) In 1991, William Riesner ("Riesner") began working for UTY as a District Sales Representative in the company's New York City office. (Ex. P to Pl.'s 56.1,[4] at 1; Riesner Dep., at 8-9.) A year later, he was promoted to District Sales Manager. (Ex. P to Pl.'s 56.1, at 1.) After approximately 18 months, he "was promoted to a key territory,"[5] and about a year later, was promoted again to regional manager. (Riesner Dep., at 9.) In April 1997, Riesner became Director of National Accounts and moved to UTY's Chicago office.[6] (Ex. P to Pl.'s 56.1, at 1.) In this role, he was responsible for the business of the NAS Division as well as supervision of four NAEs (not including Plaintiff) and an unspecified number of NSSCs. (Id. at 2; Def.'s 56.1 ¶ 7.)

---

[1]     In the record, the terms "National Account Executive," "Senior National Account Executive," and "National Account Manager" are for the most part used interchangeably, and Plaintiff noted that the title for this position underwent several changes during Plaintiff's tenure. (See Defendant's Statement of Undisputed Material Facts ¶ 4; Stern Dep., at 15, 30.) For the sake of consistency, the court refers to employees in this position as "National Account Executives."

[2]     It is undisputed that "national accounts" are "accounts that have $250,000 in volume doing business in more than three states with more than 25 units," e.g., Jack-in-the-Box, Bob Evans, and United Airlines. (Defendant's Statement of Undisputed Material Facts ¶ 9.)

[3]     Defendant's Statement of Undisputed Material Facts.

[4]     Plaintiff's Response to Defendant's Statement of Allegedly Undisputed Material Facts and Statement of Additional Facts that Require Denial of Summary Judgment.

[5]     Riesner did not explain the phrase "a key territory."

[6]     Riesner testified that UTY distinguished between two types of sales accounts—national and regional. (Riesner Dep., at 9.) The court infers from Riesner's testimony that he was considered a "regional" salesperson and manager prior to his April 1997 promotion to Director of National Accounts.

In approximately November 1997, Defendant acquired UTY. (Def.'s 56.1 ¶ 28; Pl.'s 56.1 ¶ 67.) Riesner was promoted to Vice President of National Accounts approximately six months later and, on an unspecified date between January 1, 1999 and April 15, 1999, Riesner became Plaintiff's supervisor. (Def.'s 56.1 ¶¶ 7, 8; Stern Dep., at 17; Ex. D to Def.'s 56.1; Riesner Dep., at 9.) Plaintiff took maternity leave from April 15, 1999 to August 2, 1999 to give birth to her first child. (Ex. D to Def.'s 56.1; Stern Dep., at 36-37.) Plaintiff returned from leave as a full-time NAE working three days per week in the office and two days per week from home or on the road, and was eligible to participate in the National Accounts bonus plan for fiscal year 2000.[7] (Ex. D to Def.'s 56.1; Stern Dep., at 37.)

On June 1, 2000, Plaintiff was promoted to Manager of National Account Services, in which she retained responsibility for an unspecified number of sales accounts and began supervising all of the NSSCs and providing general assistance to Riesner with his management duties, including serving as the point of contact for the nearly 60 employees whom Riesner supervised, as Riesner spent most of his time "on the road." (Def.'s 56.1 ¶¶ 15, 22; Pl.'s 56.1 ¶ 71; Ex. P to Pl.'s 56.1, at 3; Stern Dep., at 76.) Plaintiff testified that Michael DiMino ("DiMino"), President of the NASD and Riesner's supervisor, made the decision that Plaintiff would manage the NSSCs, as "the company philosophy was that [the NSSCs] needed to be .... more operationally oriented," i.e., they needed to focus "more on booking orders, getting orders out of the warehouse, [and] forecasting strategy." (Stern Dep., at 34-35.) Plaintiff did not accept supervision of the NSSCs "with great enthusiasm." (Id. at 34.) As Plaintiff "did not have an operational background," she recommended that Defendant place Debbie Zwartz ("Zwartz"), who was then in Distribution in Defendant's warehouse and whose "forte" was assertedly operational areas, in charge of managing the NSSCs. (Id. at 34-35, 90.)

---

[7]     The record does not indicate which months this bonus plan covered or whether Plaintiff had been eligible to participate in prior years.

In February 2001, Defendant did transfer supervision of the NSSCs to Zwartz, who was then pregnant, and promoted Zwartz to the same position and title Plaintiff had, that of Manager of National Account Services, reporting to Riesner.[8] (Def.'s 56.1 ¶ 16.) The court infers from the record that Zwartz had no other duties aside from managing the NSSCs. (See, e.g., Ex. P to Def.'s 56.1, at 3.) After Zwartz's promotion, Plaintiff "continued to have involvement with management" of the NSSCs and to assist Riesner with his management duties. (Def.'s 56.1 ¶ 17.) Plaintiff also managed three NAEs–Mike Olszak, Lesley Moss, and Dan O'Brien. (Id. ¶¶ 17-18.) In addition, Plaintiff assisted with recruiting, hiring, and training, which "became an increased part of her responsibility." (Id. ¶ 17; Pl.'s 56.1 ¶ 75.) Although Zwartz had no sales responsibilities, (Pl.'s 56.1 ¶ 16), there is no mention in the record that Plaintiff had any sales responsibilities after February 2001 either.

Following Zwartz's promotion, Plaintiff was concerned about her job security as she felt that her title–Manager of National Account Services–no longer accurately reflected her duties. From February 2001 until her termination in November 2001, therefore, Plaintiff "continually" requested Riesner to make her a NAE again by volunteering to give up her management responsibilities and working on new and existing client accounts. (Def.'s 56.1 ¶ 23; Pl.'s 56.1 ¶ 76; Stern Dep., at 86-87.) Although Plaintiff recognized that returning to a NAE role would have been "a step down in a way," she believed such a move "would have been the most secure thing to do." (Stern Dep., at 88.) Riesner initially responded to her requests by stating that he would be "slitting his own wrists" if he moved her into a different position, as he could not run the department without her. (Def.'s 56.1 ¶ 21; Stern Dep., at 79, 87.) On a date not specified in the record, Plaintiff asserts, Riesner told her that he would make her a NAE again "[e]ven though it would kill him." (Stern Dep., at 87.) Plaintiff added, "I know now from seeing my personnel file that he did put through the

---

[8]     The record does not indicate who made the decision to promote Zwartz into this supervisory role.

4

paperwork to have my title changed." (*Id.*) For reasons not explained in the record, Defendant did not make Plaintiff a NAE after February 2001. (Def.'s 56.1 ¶ 23; Pl.'s 56.1 ¶ 76.)

In May 2001, Plaintiff told Riesner that she was pregnant with her second child and was due to give birth in late December. (Def.'s 56.1 ¶ 24; Pl.'s 56.1 ¶ 78.) In June 2001, William Cronin ("Cronin"), replaced DiMino as President of the NAS Division and Riesner's supervisor. (Def.'s 56.1 ¶ 10.) Cronin testified that, when he became President of the NAS Division, there were no female NAEs in Defendant's national headquarters in Cincinnati, Ohio. (Cronin Dep., at 16.) In a July 1, 2001 memo to Cronin describing the structure of the NAS Division and evaluating Division personnel by rank, Riesner conveyed Plaintiff's desire to return to a sales position, describing her skills as follows:

> She was a very strong NAE . . . . She was one of the best at maintaining her accounts, keeping them clean and rolling out new programs. She knows the system very well. She did not want to travel as much so I felt it was time to elevate her to manage the NSSCs and help with roll outs and special projects I assign to her. This has been one of the best moves. She has excelled in this role, and has accepted any challenge or role given to her. She has provided some relief as identified earlier. We need to make sure she does not go anywhere. She may be a better fit in the sales role going forward, depending on how the National Accounts structure settles out. She has proven she can sell and manage National Accounts in the past. She wants to go back into selling, which I support; however, I am just without any management assistance without her.

(July 1, 2001 Memo from Riesner to Cronin ("Riesner Mem."), Ex. P to Pl.'s 56.1, at 1, 4.) Although Cronin acknowledged receiving this memo, he did not recall reading the portion of the memo evaluating Plaintiff. (Cronin Dep., at 30.)

## II. Evidence of Discrimination--May to November 2001

### A. Riesner's Alleged Statements Regarding Women in Sales Positions

In May 2001, Plaintiff claims, Maurice Toder ("Toder"), who recruited potential sales

personnel for Defendant,[9] told Plaintiff that, prior to May 2001, Riesner had instructed him not to submit applications for sales positions from women because Defendant would not hire women into its sales force. (Pl.'s 56.1 ¶¶ 23, 79; Stern Dep., at 106-07.) To support this contention, Plaintiff cites her own deposition and that of Cynthia McHugh ("McHugh"), a NAE, who testified that Plaintiff told her that Toder told Plaintiff that Defendant told him not to refer female candidates to Defendant for sales positions. (McHugh Dep., at 38-39.) Defendant objects that this assertion constitutes hearsay and is irrelevant. (Def.'s Resp. 56.1[10] ¶ 79.) This court has little difficulty with relevance. The hearsay objection is more difficult. As Toder and Riesner were acting as agents of Defendant, however, their statements are admissible under FED. R. EVID. 801(d)(2)(A). McHugh's statement would ordinarily be admissible only if Defendant has suggested that Plaintiff's testimony concerning this matter constituted a "recent fabrication." *See* FED. R. EVID. 801(d)(1)(B). The court will assume this test is met here, as the Seventh Circuit did in *Volovsek v. Wisconsin Department of Agriculture, Trade, and Consumer Protection*, 344 F.3d 680, 682 (7th Cir. 2003) ("A male coworker corroborated these allegations, recalling Volovsek's contemporaneous reporting of this incident to him").

Shortly after Plaintiff's alleged conversation with Toder, Plaintiff claims, when she recommended that Riesner interview a female applicant for a NAE position, Riesner said he was busy with traveling and asked Plaintiff, "why would you waste my time interviewing this girl?" (Pl.'s 56.1 ¶ 80; Stern Dep., at 111.) When she asked him to clarify that statement, Plaintiff asserts, Riesner responded, "you know Cintas doesn't hire women for sales positions. There are no females in the sales force in Cincinnati." (Stern Dep., at 112.) Plaintiff alleged that when she

---

[9] The record does not indicate whether Mr. Toder was an employee of Defendant or recruited potential employees for Defendant on a contract basis.

[10] Defendant's Response to Plaintiff's Statement of Additional Facts that Require Denial of Summary Judgment.

asked why there were no women in the Cincinnati sales force, Riesner responded, "they don't view women as being long-term employees." (*Id.*) When Plaintiff asked why that was so, she claimed, Riesner responded, "well, because they tend to get married and have babies." (*Id.*) Plaintiff added that Riesner's tone in making this last statement was "kind of . . . conspiratorial." (*Id.*) According to Plaintiff, Riesner concluded that any female candidate that Plaintiff recommended "had better blow away any male candidate that you have presented to me so far." (*Id.*) Riesner denied making these statements. (Pl.'s 56.1 ¶ 80.) Plaintiff notes that McHugh recalled Plaintiff's reporting that Riesner directed Plaintiff not to refer female candidates to Defendant for national account sales positions. (McHugh Dep., at 38.) Defendant again objects on hearsay grounds, (Def.'s Resp. 56.1 ¶ 80); as Riesner was acting as an agent of Defendant, however, his statement is admissible under FED. R. EVID. 801(d)(2)(A), while McHugh's statement would be admissible only if Defendant asserts that Plaintiff's testimony concerning this matter is a "recent fabrication."[11]

## B.    Lack of Performance Review and Bonus Participation

Although the record does not provide the date of Plaintiff's last performance review, it is undisputed that she did not receive a performance review from June 2001 until her termination in November. Plaintiff contends that she was due for a performance review by June 2001. (Def.'s 56.1 ¶ 25.) Defendant notes that, as of the end of October 2001, 11 male and nine female NAS Division employees, including Plaintiff, were past due for their performance reviews, (*id.* ¶ 26), but Plaintiff asserts that of these 20 employees, she alone had sales responsibilities. (Pl.'s 56.1 ¶¶ 25-26.) Defendant points out that, throughout her employment, Plaintiff's performance was reviewed

---

[11]    Plaintiff also claims she attended a meeting of Defendant's hiring managers that took place in 1991, during which one of Defendant's officials, describing the individuals Defendant wished to hire for its sales positions, stated, "breadwinners are preferred." (Pl.'s 56.1 ¶ 81; Stern Dep., at 113-14.) Plaintiff could not precisely recall when this meeting took place or who made this comment. (Stern Dep., at 114.) As Plaintiff was working for UTY in 1991, the court doubts that Plaintiff would have attended a meeting of Defendant's hiring managers at that time. In any event, even assuming this meeting took place sometime after Defendant acquired UTY in November 1997, this vague assertion cannot create a genuine issue of material fact.

sporadically and not always on an annual basis. (Def.'s 56.1 ¶ 5; Pl.'s 56.1 ¶ 68.) In any event, Plaintiff presents no evidence that her lack of a performance review led to any adverse actions being taken against her.

Plaintiff, along with 19 male and eight female NAS Division employees, were not eligible to participate in Defendant's bonus plan. (Def.'s 56.1 ¶¶ 50-51.) Plaintiff notes that all of Riesner's subordinates who had sales responsibilities, other than Plaintiff, however, were eligible for a bonus in 2001. (Pl.'s 56.1 ¶¶ 50-51.) The record does not indicate who made the decision to exclude Plaintiff from bonus eligibility or why such decision was made.

## C.    "Forced Rankings" and Organizational Charts

Beginning in February 2001, as part of an impending reorganization of the company and in connection with plans to reduce the company's work force, Defendant required the head of each department to perform a "forced ranking" of employees into "A," "B," and "C" categories. (Stern Dep., at 76-77.) Plaintiff assisted Riesner with ranking the NAS Division employees into "A" and "C" categories and with rank-ordering them within each category.[12] (Id.) Initially, Riesner ranked McHugh fifth in sales behind four male NAEs. (Stern Dep., at 125-26, 130.) According to Plaintiff, however, McHugh's "performance to plan" numbers indicated she was the "top sales person" in the NAS Division. (Stern Dep., at 125-26, 130.) Based on Riesner's earlier alleged statement that Defendant's Chicago sales team needed more closely to reflect the Cincinnati all-male sales force, Plaintiff surmises that Riesner must have placed McHugh fifth in part because of his belief that Cronin would have wanted to see men in the top positions.[13] (Id.) In an October 18, 2001 letter to Defendant's Chief Executive Officer, discussed below, Plaintiff's attorney indicated that, before

---

[12]    The record does not indicate who, if anyone, imposed the requirement that Riesner rank the staff in order within each category.

[13]    Plaintiff also testified that Riesner based this decision in part on tenure and portfolio size, although she offers no support for this contention. (Stern Dep., at 125.)

Riesner provided these rankings to Cronin, McHugh "made an excellent presentation to [Cronin], qualified for the President's Club Awards, and out-performed *all* of her male counterparts."[14] (Ex. K to Def.'s 56.1, at 3 (emphasis original); Stern Dep., at 129, 179.) After McHugh's presentation, Plaintiff contends, Riesner instructed Plaintiff to change McHugh's ranking to second, even though McHugh's numbers had not improved since Riesner had placed her fifth. (Ex. K to Def.'s 56.1, at 3; Stern Dep., at 129-30, 132, 179.) McHugh testified that she first learned that she was initially ranked fifth from a document titled "Ranking of National Account Team"[15] that she saw sitting on the desk of Riesner's assistant, Kathy Laiter, and that she was "frustrated" as she believed she should have been ranked second based on her sales performance in 2001. (McHugh Dep., at 16-18; Stern Dep., at 122.) When asked whether she believed this ranking was because of her sex, however, McHugh said, "No." (McHugh Dep., at 18-19.) Defendant does not dispute these assertions.[16]

In his July 1, 2001 memo to Cronin describing the structure of the NAS Division and evaluating Division personnel by rank, Riesner ranked eight NAEs on his team as "A's" and two as "C's." (Riesner Mem., at 4-5.) Specifically, (1) Ken Moore, (2) Cynthia McHugh (a female), (3) Dan D'Angelo, (4) Mike Olszak, (5) Sandra DiVito (a female), (6) Troy Overboe, (7) Jeff Jarvis, and (8) Dan O'Brien were ranked as "A's," and (1) Lesley Moss (a female) and (2) Don Richter were ranked as "C's." (*Id.*) In the memo, Riesner stated that he was "in the process of weeding out the C

---

[14]     Plaintiff provided no details regarding McHugh's "excellent presentation," but she indicated that the President's Club Award is "a sales contest and people who meet the criteria for our President's Club get to take a trip with the president. . . . There were other incentives for the President's Club, including a kicker on commission and higher earning potential." (Stern Dep., at 129.)

[15]     This document does not appear in the record.

[16]     Defendant objects that this assertion is irrelevant, but "admits that Plaintiff testified that she complained about McHugh's ranking, not women generally," and states that, "subsequent to Plaintiff's alleged complaint, McHugh gave a successful presentation and moved up significantly in the rankings to number two." (Def.'s Resp. 56.1 ¶ 88.)

players," (*id.* at 2); Plaintiff testified that "[a]t some point the decision was made that there was no room for the C players and that those players would be eliminated based on either performance and counseling or . . . at a more massive layoff." (Stern Dep., at 76.) Plaintiff claims that, in July or August 2001, she "complained to Riesner that women were being discriminated against in the employee performance ranking process that was then underway," and that she "complained about [D]efendant's discriminatory treatment of Cindy McHugh."[17] (Pl.'s 56.1 ¶ 88; Stern Dep., at 125-30, 178.)

### D.    Golf Outings

During the summer of 2001, Riesner invited NAS Division employees to participate in golf outings during work hours and while on the road. (Def.'s 56.1 ¶ 56; Pl.'s 56.1 ¶ 85.) Although most of the invitees appear to have been male employees, the parties agree that Riesner did not invite every male employee, and that the outings occasionally included women. (Def.'s 56.1 ¶ 56; Pl.'s 56.1 ¶ 56.) Riesner testified that these outings occurred "very, very infrequently." (Riesner Dep., at 124.) Plaintiff, who acknowledges that she does not play golf, claims that these outings were not infrequent nor did they include female employees "in any meaningful or appropriate business manner," citing her own deposition and affidavit in support. (Def.'s 56.1 ¶ 56; Pl.'s 56.1 ¶ 56.)

On an unspecified date in the summer of 2001, Plaintiff asserts, one of her subordinate NAEs, Mike Olszak ("Olszak"), allegedly missed two morning customer meetings without first notifying Plaintiff, requiring Plaintiff to cover for him. (Pl.'s 56.1 ¶¶ 86-87.) When she confronted Olszak that afternoon about his absence, Plaintiff claims, he told her that he had been playing golf with Riesner, and that Riesner had told him not to tell Plaintiff about the golf outing. (Stern Dep., at 123.) According to Plaintiff, when she complained to Riesner about what Olszak had said, Riesner at first denied that he and Olszak had been golfing. (Pl.'s 56.1 ¶ 87.) When Plaintiff

---

[17]    Plaintiff claimed that there were other women who had better "numbers" than the top four men on the list, but did not indicate who these women were. (Stern Dep., at 126.)

10

informed Riesner that Olsazk himself had told her about the outing, Plaintiff claims, Riesner became defensive and said he was entitled to play golf because he worked "like a dog." (Stern Dep., at 124.) According to Plaintiff, Riesner then told Plaintiff she "could take the ladies to get their nails done if [she] wanted." (Id.) After Plaintiff told Riesner that she had almost written up "one of our top sales executives" because he had not called in, Riesner apologized. (Id.) Plaintiff cites only her own deposition to support these assertions, which Defendant does not dispute. (Pl.'s 56.1 ¶ 87; Def.'s Resp. 56.1 ¶ 87.)[18]

Plaintiff testified that her treatment by Defendant and her relationship with Riesner "deteriorated" following her complaints to Riesner regarding the golf outings, forced rankings, and treatment of Plaintiff and "other women in the company." (Stern Dep., at 177-78.) Specifically, Plaintiff claimed that she suffered "[c]ontinued denial of my title, my raise, perhaps . . . a bonus plan" and that Riesner stopped telling her that he was trying to persuade Cronin to make her a NAE. (Id. at 180-81.)[19] Defendant does not contest these assertions. (Def.'s Resp. 56.1 ¶ 89.)[20]

Between February and July 2001, Plaintiff contends, her name "stopped appearing on proposed organizational charts circulated in connection with [the] reorganization." (Pl.'s 56.1 ¶ 84; Stern Dep., at 52.) When Plaintiff asked Riesner and Cronin why her name was omitted from these charts, she claims, they told her that she "shouldn't worry about it." (Stern Dep., at 53.) Defendant

---

[18]    Defendant objects that this information is irrelevant, but "admits that Plaintiff testified that she complained about the golf outing because the incident almost caused her to write up Mike Olszak, one of the top sales executives [and] that Plaintiff testified that in the same conversation, Riesner suggested manicures and apologized to Plaintiff; thereafter it did not happen again." (Def.'s Resp. 56.1 ¶ 87.)

[19]    Plaintiff also claimed that, following her complaint to Riesner regarding the forced rankings, she "was no longer involved in or privy to the forced rankings." (Stern Dep., at 178-79.) She did, however, acknowledge being "involved in the subsequent forced rankings where Ms. McHugh's rating was increased." (Id. at 179.)

[20]    Defendant merely "admits that Plaintiff testified that after she complained to Riesner, her relationship with Riesner deteriorated." (Def.'s Resp. 56.1 ¶ 89.)

does not dispute these assertions. (See Def.'s 56.1 ¶ 84.)

### E. Cronin's Alleged Comments Regarding Plaintiff's Pregnancy

According to Plaintiff and McHugh, on two or three occasions during an August 1, 2001 meeting attended by 30 to 40 NAS Division salespeople, in response to Plaintiff's expression of her views concerning NAS Division issues, Cronin stated that Plaintiff's views did not "really matter" as she was "not even going to be here" due to her impending maternity leave. (Def.'s 56.1 ¶ 54; Pl.'s 56.1 ¶ 90; Stern Dep., at 137-39; McHugh Dep., at 33-34.) Cronin could not recall whether Plaintiff made any comments or suggestions during the meeting but denied making the alleged statement. (Cronin Dep., at 33.)

In early August 2001, Plaintiff asserts, she asked Cronin to meet with her to discuss her employment situation. (Stern Aff. ¶ 8.) Cronin looked at her stomach and responded that he would be traveling for two weeks, Plaintiff claims, adding, "I'm not sure you could wait that long." (Id.) Plaintiff claims she assured him that she was in good health and would be happy to wait to meet with him. (Id.)

On August 20, 2001, Cronin did meet with Plaintiff to discuss her employment situation. (Pl.'s 56.1 ¶ 92.) At this meeting, Plaintiff claims, she "expressed her concerns and feeling of insecurity" regarding her job title and lack of a performance review. (Id.) Plaintiff testified that Cronin responded that he did not want to speak to her about these issues until she returned from maternity leave, and "stated that he didn't feel that it would be fair for the company – for him to give me a title or an assignment when I was going to be leaving on maternity leave." (Stern Dep., at 81.) Plaintiff contends that, had she remained employed by Defendant, she would not have taken maternity leave until December 2001.[21] (Id.) Cronin denied making these statements, although

---

[21]     Plaintiff also cites McHugh's deposition, in which she testified that Plaintiff told her "there were references to her pregnancy" during some of Plaintiff's meetings with Cronin. (McHugh Dep., at 38.) As discussed above, McHugh's statement would be admissible only if Defendant (continued...)

he did not recall what was discussed during the August 20 meeting. (Cronin Dep., at 33-36.) Defendant objects that these assertions constitute "hearsay in part," (Def.'s 56.1 ¶ 92), but the court notes that Cronin's statement is admissible under FED. R. EVID. 801(d)(2)(A).

After this August 20 meeting, Plaintiff contends, Riesner directed her to answer telephones during some weekday departmental meetings and excluded her from weekend meetings, while Plaintiff's supervisees attended these meetings. (Pl.'s 56.1 ¶ 95; Stern Dep., at 150-51.) According to Plaintiff, Riesner told her that her "presence wasn't required, that [she would] probably be more comfortable answering the phones, and that [she] should stay home and rest on Saturdays rather than coming to an all-day meeting." (Stern Dep., at 151.)[22]

During a September 2001 meeting in Cronin's office in which Plaintiff and another participant were standing, Plaintiff alleges, Cronin interrupted the conversation and told Plaintiff that she should sit down due to her pregnancy. (Pl.'s 56.1 ¶ 93.) When Plaintiff expressed her preference to stand, Cronin stated that the meeting would not continue until she sat. (Id.) Cronin himself had no recollection of any meeting at which he told Plaintiff "that she should sit down because she was pregnant." (Cronin Dep., at 36.)

During a subsequent meeting on an unspecified date, Cronin, Plaintiff, and Linda Pilar ("Pilar"), Human Resources Manager for Defendant's Chicago office, were discussing possible disciplinary actions against one of Plaintiff's supervisees. Plaintiff recalls that Cronin stated that he did not understand why Plaintiff was so upset, as his wife had been "very happy during her pregnancy," adding, "but then she wasn't working during her pregnancy." (Def.'s 56.1 ¶ 52; Pl.'s

---

[21](...continued)
asserts that Plaintiff's testimony concerning this matter is a "recent fabrication."

[22]     Plaintiff also claims in her statement of facts that she "continued to hear" that her name did not appear on organizational charts being circulated during the reorganization planning process, but cites no support for this contention. (Pl.'s 56.1 ¶ 95.)

56.1 ¶ 94; Stern Dep., at 144-45.) Cronin denied making this statement. (Cronin Dep., at 36-37.)[23]

**F.    Letters and Charge of Discrimination and Changing Job Duties**

In an October 18, 2001 letter to Defendant's Chief Executive Officer ("CEO"), Plaintiff's attorney alleged that Plaintiff had a "strong case of pregnancy discrimination against [Defendant,] as well as a claim for gender discrimination based on a continuing pattern of discriminatory treatment to which she and other women at the Company ha[d] been subjected." (Ex. K to Def.'s 56.1, at 1.) On an unspecified date, Plaintiff's attorney sent copies of this letter to Larry Fultz, Defendant's Vice President for Human Resources, and Linda Pilar, the Human Resources Manager for Defendant's Chicago office. (*Id.* at 5; Pl.'s 56.1 ¶¶ 66, 96.) The fax header at the top of each page of the letter indicates that, on October 22, 2001, it was transmitted to Defendant's NAS Division in Chicago. (Ex. K to Def.'s 56.1; Stern Aff. ¶ 6.)

On October 31, 2001, Riesner told Plaintiff that he had been reassigned to head the NAS Division's Hotel Division. (Def.'s 56.1 ¶¶ 31, 35; Pl.'s 56.1 ¶ 97.) In this role, Riesner had only one sales representative (Jeff Jarvis) reporting to him, and therefore "no longer needed Plaintiff to

---

[23]    Defendant implies that Plaintiff should have used its "Hot Line" to report her claims of discrimination. (Def.'s 56.1 ¶¶ 57-58.) It is undisputed that, on September 28, 2001, Plaintiff participated in Defendant's sexual harassment training, and signed a statement acknowledging that, if she believed she was "a victim of sexual harassment," Defendant had established "several methods for reporting such behavior, including through a neutral third party, the use of the Cintas Hot Line or Direct Line Communication System." (Ex. Q to Pl.'s 56.1, at 1.) Plaintiff was also told that, if she had any questions or concerns, she could ask to speak privately with her supervisor, his supervisor, the local Human Resources Coordinator, or the President of her division directly. (*Id.*) Defendant claims the training also involved methods for reporting "discriminatory conduct," but offers no support for this contention. (Def.'s 56.1 ¶ 57.) Plaintiff never used any of the methods set forth in the training or otherwise reported any of Cronin's or Riesner's alleged comments. (Def.'s 56.1 ¶ 58; Pl.'s 56.1 ¶ 58.) In Plaintiff's view, Defendant's "Hot Line" was for use by an employee who, unlike Plaintiff, believed herself to be "a victim of sexual harassment." (Pl.'s 56.1 ¶ 58.) There is no evidence in the record that Defendant expected employees to use this "Hot Line" to report alleged sex or pregnancy discrimination or retaliation. In any event, Plaintiff asserts that she had previously discussed her employment situation with Riesner and Cronin, (*id.*); the court presumes Plaintiff is referring to her questioning Riesner and Cronin as to why her name was omitted from proposed organizational charts, (Stern Dep., at 53), and her August 20, 2001, meeting with Cronin to discuss her employment situation. (Pl.'s 56.1 ¶ 92.)

assist him with his management duties." (Def.'s 56.1 ¶¶ 31-32, 42.) Also on October 31, Riesner also told Plaintiff that she would no longer be supervising any NAEs. Of the three NAEs Plaintiff had been supervising, only Mike Olszak retained his NAE position; Lesley Moss was demoted to a NSSC position,[24] and Dan O'Brien was eliminated.[25] (Def.'s 56.1 ¶¶ 35-36; Pl.'s 56.1 ¶¶ 36-37, 97; McHugh Dep., at 39-40; Riesner Mem., at 3.) Riesner also told Plaintiff that she would not be in either the Hotel Division or the NAS Division. (Pl.'s 56.1 ¶ 97; Ex. I to Def.'s 56.1.) Also on October 31, Plaintiff filed a Charge of Discrimination with the EEOC and the IDHR, alleging that she had experienced sex and pregnancy discrimination as early as May 1, 2001. (Ex. L to Def.'s 56.1.)

In a November 5, 2001 memo to the NAS Division management team, Cronin explained that, "[i]n an effort to become one company, we are combining our National Accounts sales force in Cincinnati with our National Accounts sales force in Chicago. . . . [and] dividing the country into [two] geographic zones . . . . Steve Cochran will be running the West, and Phil Schneider will be running the East."[26] (Ex. H to Def.'s 56.1.) Plaintiff claims that she was "never even considered for such a position despite the fact that she was highly qualified and had worked closely with Riesner managing the [NAS Division] for approximately three years," citing her own deposition and affidavit in support. (Pl.'s 56.1 ¶ 33.)

During a November 5-6, 2001 NAS Division meeting, Plaintiff was assigned to answer customer phone calls rather than attend the meeting. (Def.'s 56.1 ¶ 38.) In a November 6, 2001

---

[24]    As noted earlier, Riesner indicated in his July 1, 2001 memo that he was "in the process of weeding out" Lesley Moss, as he had ranked her a "C." (Riesner Mem., at 2, 5.)

[25]    Plaintiff testified that O'Brien had been ranked a "C player," and that "there was no room for C players anymore." (Stern Dep., at 78-79.)

[26]    Cronin actually indicated in his memo that there would be three geographic zones (West, Central, and East), but Defendant never in fact created a central region. (Def.'s 56.1 ¶ 33.) The record does not indicate when or how Defendant selected Messrs. Cochran and Schneider to head the two new regions.

letter to Defendant's outside counsel, Plaintiff's attorney asserted that Defendant's decisions to remove the three NAEs from Plaintiff's supervision, not to place her in either the Hotel Division or the NAS Division, and to assign her to answer phones during the November 5-6, 2001 NAS Division meeting "constitute[d] retaliation for her asserting her discrimination claims." (Ex. M to Def.'s 56.1, at 1.) The letter added that if Defendant's counsel did not contact Plaintiff's attorney by November 9, 2001, Plaintiff's attorney would amend Plaintiff's EEOC charge to add a retaliation claim. (*Id.* at 2.)

Cronin and Riesner testified that, prior to Plaintiff's termination, they had not seen either of the letters penned by Plaintiff's attorney and were unaware of Plaintiff's EEOC charge. (Def.'s 56.1 ¶ 66; Riesner Dep., at 114-16; Cronin Dep., at 49-55.) Plaintiff disputes this contention, claiming that, as Plaintiff's attorney sent a copy of the October 18 letter to Pilar, and as a copy of the letter was faxed to the Chicago office on October 22, 2001, "a jury reasonably could disbelieve Cronin['s] and Reisner's testimony that they were not made aware of the letter's allegations during the following weeks." (Pl.'s 56.1 ¶¶ 66, 96.) According to Plaintiff, the fact that Plaintiff's attorney addressed the November 6, 2001 letter to Defendant's counsel demonstrates that Defendant had retained counsel in response to her initial October 31, 2001 EEOC charge. (Pl.'s 56.1 ¶ 66.) She asserts that "[a] jury reasonably could disbelieve that defendant would have retained counsel before Cronin and Riesner even had been informed about Stern's discrimination claims." (*Id.*) Plaintiff also notes that Pilar testified that she first became aware of Plaintiff's EEOC complaint "[w]hen we received the complaint from the EEOC" and that, after reviewing the complaint, she discussed it with Cronin and Riesner. (Pilar Aff. ¶¶ 1-2; Pilar Dep., at 66-69, 71-73.) Again, in Plaintiff's view, a reasonable jury could conclude that Pilar had reviewed and discussed the complaint with Cronin and Riesner prior to Plaintiff's termination. Defendant points out that Pilar believed Defendant had received the complaint in late November or early December 2001; nevertheless, the court notes, Pilar could not recall whether Defendant had received the complaint

16

prior to Plaintiff's termination. (*Id.* at 66-69.)

On November 14, 2001, Plaintiff filed an amended Charge of Discrimination with the EEOC, alleging that she had been subjected to retaliation for the October 18, 2001 letter. (Def.'s 56.1 ¶ 47; Ex. N to Def.'s 56.1, at 4.) Defendant's retaliatory actions, Plaintiff alleged, included stripping her of responsibility for managing the three NAEs and excluding her from meetings and projects affecting national account sales, as she was forced to answer phones while her "former subordinates and colleagues" attended such meetings. (Ex. N to Def.'s 56.1, at 4.) Further, the complaint stated, despite Plaintiff's "expressed desire to take on additional tasks and contribute to national account sales," she was assigned only administrative tasks. (*Id.*) Plaintiff's amended EEOC complaint did not mention Plaintiff's termination.

III.    **Plaintiff's November 14, 2001 Termination**

On an unspecified date prior to November 14, 2001, Riesner submitted to Cronin a list of Riesner's supervisees, including Plaintiff, whom he recommended for termination; Cronin approved the entire list. (Def.'s 56.1 ¶ 40.) The parties agree that "Riesner made the decision to terminate Plaintiff's employment." (*Id.*; Pl.'s 56.1 ¶ 40.) Plaintiff claims Cronin was also an "acknowledged decisionmaker," (Pl.'s Mem.,[27] at 8), while Defendant characterizes his role as "limited" and passive, as he chose merely to approve Riesner's decision to terminate Plaintiff and others. (Def.'s Reply Mem.,[28] at 4 n.2.) On November 14, 2001, Riesner met with Plaintiff and told her that her employment was terminated as of that date. (Def.'s 56.1 ¶¶ 39, 43.) During this meeting, Plaintiff asked Riesner if he was aware that she had filed charges with the EEOC, and he replied that he was not. (*Id.* ¶ 43.) Riesner apologized to Plaintiff if any conduct on his part led to her filing her EEOC charge. (Pl.'s 56.1 ¶ 43.)

---

[27]    Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment.

[28]    Defendant's Reply Memorandum in Support of Motion for Summary Judgment.

Defendant asserts that it terminated Plaintiff because "[t]here was no role remaining for Plaintiff in the organization [as] [t]here was no sales management role in the NAS Division after the reorganization." (Def.'s 56.1 ¶ 42.) To support this contention, Defendant notes Riesner's explanation for why he made the decision to terminate Plaintiff:

> Well, the main reason, first of all, I was running the hotel division with one salesperson. I didn't need any assistance . . . managing a sales force of one. My responsibilities [lay] mostly [in] trying to become an expert to other national account managers and their approach to the hotel business. And based on the inability to travel and the, you know, restrictions with the hours and all that, I didn't feel like . . . sales was available to her as well. And there really was no role in the organization. There was no sales management side to our national account picture anymore. It was broken up to east, west, airlines, and hotels. And Phil Schneider and Steve Cochran didn't have a person in that role. They handled it themselves. And I didn't need anybody for the hotel division.

(Riesner Dep., at 142–43.) As noted earlier, Riesner stated in his July 1, 2001 memo to Cronin that Plaintiff "did not want to travel as much so I felt it was time to elevate her to manage the NSSCs and help with roll outs and special projects I assign to her." (Cronin Mem., at 4.) Apart from these statements by Riesner, however, there is no evidence in the record that Plaintiff advised Riesner that she was unable to travel or had to restrict her working hours. Although Plaintiff does not contest these remarks, she testified that, beginning with her return from her first maternity leave in August 1999, Riesner "often alluded to the fact that one of the reasons that he was not putting me back into sales–in addition to the fact that it would be slitting his own wrists, was because I probably didn't want to travel based on my pregnancy," and made "inferences . . . about my preferences regarding my career and the fact that I would rather go managing people than traveling and being in sales." (Pl.'s 56.1 ¶ 70; Stern Dep., at 149.) Plaintiff insisted, however, that she did in fact "want to travel" and never told Riesner otherwise. (Stern Dep., at 149.) Defendant does not contest these assertions.[29]

---

[29]     Defendant objects that these assertions are irrelevant, but "admits that Plaintiff testified . . . that Riesner made such comments." (Def.'s 56.1 ¶ 70.)

On December 3, 2001, Plaintiff filed a new Charge of Discrimination with the EEOC and the IDHR. (Ex. O to Def.'s 56.1.) In addition to the allegations set forth in Plaintiff's November 14, 2001 amended charge, this new charge claimed that Plaintiff had been terminated because of her sex and pregnancy and in retaliation for complaining about "the discriminatory treatment to which [she] had been subjected." (Id.)

In November and December 2001, Defendant underwent a reduction in force ("RIF"), in which it terminated 141 NAS Division employees, including one male NAE, Dan O'Brien, and demoted two female NAEs to NSSC positions—Lesley Moss and Sandra DiVito. (Def.'s 56.1 ¶¶ 34, 37; Pl.'s 56.1 ¶¶ 34, 37, 61, 104; McHugh Dep., at 40-41.) After the RIF, there were five male NAEs—Ken Moore,[30] Dan D'Angelo, Mike Olszak, Troy Overboe, and Jeff Jarvis—and one female NAE—McHugh. (Def.'s 56.1 ¶¶ 37, 60; Pl.'s 56.1 ¶¶ 37, 103; Def.'s Resp. 56.1 ¶ 103; Pilar Aff. ¶ 6.) Defendant also retained Debbie Zwartz following the RIF, although the record does not indicate whether she continued to serve as Manager of National Account Services. (Def.'s 56.1 ¶ 62.)

Plaintiff notes that Defendant demoted DiVito while retaining male NAEs Overboe and Jarvis, despite the fact that, in his July 1, 2001 memo to Cronin, Riesner had ranked DiVito higher than Overboe and Jarvis.[31] (Pl.'s 56.1 ¶ 104; Riesner Mem., at 5.) Plaintiff also points to the fact

---

[30]     Although the record does not indicate that Ken Moore was one of the five male NAEs retained in the RIF, the court infers that he was retained based on the fact that he had the highest sales numbers according to Riesner's July 1, 2001 memo to Cronin. (Riesner Mem., at 4.)

[31]     Plaintiff and McHugh testified that DiVito, who has since resigned from Defendant, believed that her demotion was the result of gender discrimination. (Pl.'s 56.1 ¶¶ 37, 104; McHugh Dep., at 43.) Defendant urges that "[t]here is no admissible evidence regarding DiVito's beliefs and there is no evidence in the record to establish when her job duties changed." (Def.'s Resp. 56.1 ¶ 104.) The court agrees that Plaintiff's and McHugh's testimony regarding DiVito's alleged statements are inadmissible hearsay. The court is puzzled, however, as to why Defendant acknowledges that DiVito was demoted but does not offer the date of her demotion.
    Plaintiff also claims that "McHugh believes that Cintas has discriminated against other women in its sales force, including herself." (Pl.'s 56.1 ¶ 61.) To support this contention, Plaintiff cites her own deposition and affidavit and 27 pages of McHugh's testimony, in which McHugh expressed her own frustration and the frustration of other female employees regarding certain
(continued...)

that McHugh, the only female NAE after the RIF, has no children. (McHugh Dep., at 6.) Plaintiff believes she was better qualified than all of the NAEs whom Defendant retained except Ken Moore, (Def.'s 56.1 ¶¶ 60-61; Pl.'s 56.1 ¶ 103), but her only apparent basis for this belief is her assertion that Riesner ranked Plaintiff "at the top of his 'team,'" above these four NAEs, in his July 1, 2001 memo to Cronin. (Riesner Mem., at 4-5.) Plaintiff is not in fact included in Riesner's ranking of the NAEs, however. (Id.) Plaintiff also claims that "Messrs. D'Angelo, Olszak, Overboe and Jarvis all had shorter tenures at UTY/Cintas than Stern, as well as less experience than Stern in sales in the uniform rental industry." (Pl.'s 56.1 ¶ 107.) To support this contention, Plaintiff cites her own deposition, in which she testified that she was better qualified those four male NAEs and further stated that Olszak "did not have the tenure or the experience or the proven track record that I did within the company and within the industry." (Stern Dep., at 170-73.) She also notes that Riesner stated in his July 1, 2001 memo to Cronin that Overboe had "just [been] brought over from being an RSM" (presumably, a "Regional Sales Manager"), and that D'Angelo, Olszak, and Jarvis had been NAEs but were "now Senior National Account Executives."[32] (Riesner Mem., at 2-5.)

---

[31](...continued)
management decisions but also stated that she did not believe any of these actions were the result of discriminatory motives. (McHugh Dep., at 17-43.)

    In addition, Plaintiff asserts that Jarvis was "the subject of many disciplinary issues involving inappropriate behavior." (Pl.'s 56.1 ¶ 106.) Specifically, Plaintiff alleges, Jarvis "had several loud confrontations with employees, tried to hire underage female models to work at his photo shoots, and passionately kissed girlfriends at his photo shoots, in the presence of customers and employees." (Id.) To support this contention, Plaintiff cites her own deposition. (Id.) Defendant objects that this factual assertion is irrelevant, but "admits that Plaintiff testified to the above in her deposition." (Def.'s Resp. ¶ 106.) Plaintiff does not indicate what relevance this fact has to this case.

[32]    In that memo, Riesner indicated that he managed both "Senior National Account Executives," who were "the highest-level sales reps that have portfolio and quota responsibility," and "National Account Executives," who were "newer executives who were learning the business from the Senior National Account Executives, while focusing more on existing accounts." (Riesner Mem., at 2.) As discussed in note 1, however, the terms "National Account Executive," "Senior National Account Executive," and "National Account Manager" are for the most part used interchangeably in the record, and the court refers to employees in this position simply as "National (continued...)

In April 2002, according to Cronin, Defendant hired two female and one or two male NAEs as a result of an acquisition. (Cronin Dep., at 59-60.) As of July 31, 2003, the date Cronin was deposed, however, there was once again only one female NAE, McHugh, of ten NAEs. (*Id.* at 16-17.)[33]

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate when, construing the facts in the light most favorable to the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1024 (7th Cir. 2003) (citation omitted). Thus, the court may grant summary judgment only "if, on the record as a whole, a rational trier of fact could not find for the non-moving party." *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 598 (7th Cir. 2003) (citation omitted).

Plaintiff claims that Defendant discriminated against her because of her sex and pregnancy and retaliated against her in violation of Title VII and the Civil Rights Act of 1991 by altering the terms and conditions of her employment and ultimately terminating her. (Compl. ¶ 1.) Because Plaintiff's claims for sex and pregnancy discrimination claims are factually intertwined, the court considers these claims together. The court then turns to Plaintiff's retaliation claim.

---

[32](...continued)
Account Executives."

[33]     Cronin testified that there are six male NAEs in Defendant's Cincinnati headquarters, three male NAEs in the Chicago office, and one female NAE, McHugh, in Chicago. (Cronin Dep., at 16-17.) Plaintiff also contends that, at the time Defendant acquired UTY, the NAS Division sales force was predominantly female and that "over time, the sales force began to be more male than female," but offers no support for this contention. (Pl.'s 56.1 ¶ 67.)

21

## II.     Sex and Pregnancy Discrimination Claims

Plaintiff argues that Defendant discriminated against her because of her sex and pregnancy. Title VII forbids employers "to discharge any individual, or otherwise to discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). The Pregnancy Discrimination Act of 1978, which amended Title VII, provides that the term "because of sex" includes "because of . . . pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work. . . ." 42 U.S.C. § 2000e(k). The PDA was enacted "to address the stereotype that women are less desirable employees because they are liable to become pregnant, and to insure that the decision whether to work while pregnant was reserved for each individual woman to make for herself." *Maldonado v. U.S. Bank*, 186 F.3d 759, 762 (7th Cir. 1999) (internal quotations marks and citations omitted). Our Court of Appeals has stated that "an employer cannot discriminate against a pregnant employee simply because it believes pregnancy *might* prevent the employee from doing her job." *Id.* at 761-62.

Under the Civil Rights Act of 1991, a plaintiff may recover compensatory damages "for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses" and punitive damages if the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1), (3). As it is undisputed that Defendant is an employer subject to Title VII and the Civil Rights Act of 1991, (Compl. ¶ 6; Ans. ¶ 6), the first question before the court is whether a reasonable jury could conclude that Defendant discriminated against Plaintiff because of her sex or because she was

22

pregnant. To answer this question, the court must determine whether (1) Plaintiff suffered one or more "materially adverse employment actions," and (2) whether these actions resulted from discriminatory animus.

### A.    Materially Adverse Employment Actions

Our Court of Appeals uses the phrase "materially adverse employment actions" to encompass the statutory language, "discharge . . . or . . . discriminate . . . with respect to . . . compensation, terms, conditions, or privileges of employment." *See Volovsek v. Wis. Dep't of Agric., Trade, and Consumer Prot.*, 344 F.3d 680, 687 (7th Cir. 2003) (citing 42 U.S.C. § 2000e-2(a)(1)). A materially adverse employment action under Title VII is something "more disruptive than a mere inconvenience or an alteration of job responsibilities," *Crady v. Liberty Nat'l Bank and Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993); rather, it is "a significant change in the claimant's employment status such as hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (citation omitted). "Not everything that makes an employee unhappy qualifies as adverse employment action." *Id.* (citation omitted).

In her Complaint, Plaintiff identifies the materially adverse employment actions as including, but "not limited to, the denial of a job title, job description, annual review, bonus plan, [and] raise" and termination of her employment. (Compl. ¶ 1.) The latter clearly constitutes an adverse employment action, as it appears in the statute itself. 42 U.S.C. § 2000e-2(a)(1). Plaintiff does not argue in her brief that she was denied a job description or raise, and such arguments are deemed waived. Further, Defendant's failure to provide a performance review, without more, does not constitute "a significant change" in Plaintiff's employment status akin to "hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits." *Rhodes*, 359 F.3d at 504; *cf. Haywood v. Lucent*

*Techs., Inc.*, 323 F.3d 524, 532 (7th Cir. 2003) ("As for the negative performance evaluations, it is well established that these alone do not constitute an adverse employment action.")

Whether Defendant's failure to grant Plaintiff's request to transfer to a different position within the organization is more difficult, but the court believes Plaintiff has met her burden in this regard. Defendant never granted Plaintiff's repeated requests, beginning in February 2001, to make her a NAE, a position that Plaintiff had held prior to her June 2000 promotion to Manager of National Account Services. This court found no Title VII cases in which an employee challenged her employer's denial of a requested demotion. Our Court of Appeals has stated that "a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either." *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir.1996).[34] Other Courts of Appeals have, similarly, held that denial of an employee's request for a purely lateral transfer does not qualify as an adverse employment action for Title VII purposes. *Cf. Burger v. Cent. Apartment Mgmt., Inc.*, 168 F.3d 875, 879 (5th Cir. 1999) (finding that the "clear trend of authority" in other circuits holds that "a purely lateral transfer is not an adverse employment action") (internal quotation marks and citations omitted). On the other hand, if a plaintiff believes a requested transfer will be more secure, she might have a cognizable claim under Title VII. *Burger*, 168 F.3d at 880 ("Had [defendant] denied [plaintiff] the transfer and then let him go when the . . . contract expired, [plaintiff] may have had a cognizable anti-retaliation claim").

In this case, beginning in February 2001, Plaintiff requested a transfer or demotion to other positions because she believed her position was not secure. Such fears were realized when Defendant, after denying Plaintiff's transfer request for approximately nine months, terminated

---

[34]     As discussed below, however, in retaliation claims, courts "often take a more generous view of what events constitute actionable claims." *Volovsek*, 344 F.3d at 688 n.5.

24

Plaintiff. Riesner himself appeared also to recognize the value of the transfer or demotion, as he expressed supported for her return to a NAE position and, according to Plaintiff, he prepared the paperwork for such a transfer. (Riesner Mem., at 4; Stern Dep., at 87.) Thus, the adverse employment actions Plaintiff can legitimately point to are the denial of eligibility to participate in Defendant's bonus plan, the denial of her request to be made a NAE, and her termination.

### B.    Evidence of Discriminatory Animus

In her brief, Plaintiff essentially claims that Riesner and Cronin did not believe that mothers and mothers-to-be should be in sales. Under Title VII, an employer may not treat mothers and mothers-to-be differently from fathers and fathers-to-be. See Phillips v. Martin Marietta Corp., 400 U.S. 542, 544 (1971) (distinct hiring policies for women and men–each having pre-school-age children–not permitted under Title VII); Venturelli, 350 F.3d at 597, 600 (comment that some women change their mind about working once they have the child in their arms, if made by decisionmaker, might constitute direct evidence of pregnancy discrimination). Plaintiff can prove intentional sex discrimination directly or indirectly. Volovsek, 344 F.3d at 689.

Under the direct method, there are two types of permissible evidence. Venturelli, 350 F.3d at 599. The first is direct evidence, or "evidence that, if believed by the trier of fact, would prove the fact in question without reliance on inference or presumption," that is, "essentially . . . an admission [of wrongdoing] . . . ." Id. (internal quotation marks and citation omitted). The second type of evidence is circumstantial evidence, or "evidence that allows a jury to infer intentional discrimination by the decisionmaker." Id. (citation omitted). In this case, the parties agree that "Riesner made the decision to terminate Plaintiff's employment." (Def.'s 56.1 ¶ 40; Pl.'s 56.1 ¶ 40.) As noted above, Plaintiff claims Cronin was also an "acknowledged decisionmaker," (Pl.'s Mem., at 8), while Defendant characterizes his role as "limited" and passive, as he chose merely to approve Riesner's decision to terminate Plaintiff and others. (Def.'s Reply Mem., at 4 n.2.) Viewing

the facts in the light most favorable to Plaintiff, Cronin qualifies as a co-decisionmaker, as the record indicates that Riesner was at one time trying to persuade Cronin to make Plaintiff a NAE and he had the authority to override Riesner's recommendation that Plaintiff be terminated.

### 1.   Direct Evidence

According to Plaintiff, Cronin told Plaintiff that it would not be fair to the company to give her a sales position or performance review until she returned from maternity leave and that he did not wish to discuss the matter further until that time. (Pl.'s 56.1 ¶ 92.) Further, Plaintiff contends, Riesner testified that "based on the inability to travel and the, you know, restrictions with the hours and all that, I didn't feel like . . . sales was available to her." (Riesner Dep., at 142-43.) As noted earlier, there is no evidence in the record that Plaintiff advised Riesner that she was unable to travel or had to restrict her working hours. Further, the record shows that, while Plaintiff was a NAE, she took maternity leave from April 15, 1999 to August 2, 1999 to give birth to her first child. (Ex. D to Def.'s 56.1; Stern Dep., at 36-37.) There is no evidence in the record that Plaintiff was deemed unqualified for a sales position either before taking maternity leave for her first pregnancy or after returning from such leave. As noted earlier, Plaintiff returned from leave after her first pregnancy as a full-time NAE, working three days per week in the office and two days per week from home or on the road. (Ex. D to Def.'s 56.1; Stern Dep., at 37.) As Defendant has not argued that it had a legitimate reason for not making Plaintiff a NAE, Cronin's alleged statement that he did not wish to do so simply because of Plaintiff's pregnancy arguably constitutes direct evidence that the decision to deny her request to become a NAE was because of her pregnancy in violation of Title VII.

### 2.   Circumstantial Evidence

Even assuming the two statements discussed above do not suffice as direct evidence of discrimination, the court finds that sufficient circumstantial evidence exists to warrant denying

summary judgment under the direct method. Circumstantial evidence of discrimination under the direct method includes "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Venturelli*, 350 F.3d at 601 (citation omitted).[35]

In her brief, Plaintiff points to several ambiguous statements, as well as behavior toward or comments directed at Plaintiff and other employees in the protected group, that could lead a reasonable jury to conclude that Riesner and Cronin believed that women in general, and mothers and mothers-to-be in particular, were not fit for sales positions. Our Court of Appeals has explained that "[s]tray workplace comments unrelated to the alleged discriminatory employment decision are not sufficient to support an inference of discrimination." *Schreiner v. Caterpillar, Inc.*, 250 F.3d 1096, 1099 (7th Cir. 2001) (citations omitted). Discriminatory feelings expressed by "the decision makers themselves, or those who provide input into the decision . . . (1) around the time of, and (2) in reference to, the adverse employment action complained of" is evidence of discrimination. *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001).

First, Plaintiff alleges, a sales recruiter working for Defendant told Plaintiff that Riesner had instructed him not to submit applications for sales positions from women because Defendant would not hire women for its sales force. (Pl.'s 56.1 ¶¶ 23, 79.) Second, according to Plaintiff, Riesner, the undisputed decisionmaker, told Plaintiff that Defendant "does not hire women for sales positions," that Defendant's management does not "view women as being long-term employees . . . because they tend to get married and have babies," and that Defendant's Chicago sales force

---

[35]     Circumstantial evidence may also include evidence, though not necessarily rigorous statistical evidence, that the employer systematically treated similarly situated employees outside of the protected class more favorably, and "evidence that the plaintiff was qualified for the position in question but passed over in favor of a person not having the forbidden characteristic and that the employer's stated reason for its decision is unworthy of belief, a mere pretext for discrimination." *Venturelli*, 350 F.3d at 601 (citation omitted); *Volovsek*, 344 F.3d at 689.

27

needed to mirror more closely the all-male sales force at Defendant's Cincinnati headquarters. (*Id.* ¶ 80.) Third, Plaintiff claims, Riesner told Mike Olszak not to tell Plaintiff that they had been playing golf; when Plaintiff confronted Riesner, he said Plaintiff "could take the ladies to get their nails done if [she] wanted." (Stern Dep., at 123-24.) Fourth, Plaintiff claims, Cronin stated that he did not understand why Plaintiff was so upset during a meeting, as his wife had been "very happy during her pregnancy," adding, "but then she wasn't working during her pregnancy." (Pl.'s 56.1 ¶ 94.) Fifth, Plaintiff alleges, Cronin looked at Plaintiff's stomach and stated that he would be traveling for the next two weeks and was not sure Plaintiff could wait that long to meet with him. (Stern Aff. ¶ 8.) Sixth, as noted earlier, Plaintiff claims, Cronin stated that it would not be fair to the company to give her a sales position or performance review until she returned from maternity leave. (Pl.'s 56.1 ¶ 92.) Seventh, on two or three occasions during a meeting attended by 30 to 40 NAS Division salespeople, Plaintiff contends, Cronin stated that Plaintiff's views did not "really matter" as she was "not even going to be here" when the reorganization took effect due to her impending maternity leave. (Pl.'s 56.1 ¶ 90; McHugh Dep., at 33-34.) Eighth, as discussed above, Plaintiff contends, Riesner testified that "based on the inability to travel and the, you know, restrictions with the hours and all that, I didn't feel like . . . sales was available to her." (Riesner Dep., at 142-43.)

Defendant characterizes Riesner's and Cronin's comments as merely "a jumble" of "inappropriate but isolated comments that amount to no more than 'stray remarks' [that] are insufficient to overcome summary judgment." Defendant claims that the evidence shows that these comments were unrelated to Defendant's failure to make Plaintiff a NAE or its decision to terminate Plaintiff. First, Defendant notes, Plaintiff had first requested a new title in February 2001, three months before she announced she was pregnant, and Riesner initially did not wish to move Plaintiff into a NAE position because he needed her assistance with his management duties. Second, Riesner wrote a memo to Cronin on July 1, 2001, after Plaintiff announced her pregnancy, in which he spoke highly of her abilities. Third, most of Riesner's alleged comments were made in the

summer of 2001; Cronin's, in August 2001, three months before Plaintiff's termination. Fourth, none of these alleged remarks was made in response to Plaintiff's request for a sales position. Fifth, there is no evidence in the record that there were any open NAE positions which Plaintiff was denied. Sixth, Defendant had retained female NAE McHugh in the RIF, and since Plaintiff was terminated in November 2001, Defendant had acquired additional female NAEs (although, as noted earlier, both had left the company by July 2003). Defendant therefore urges that "[t]he only possible inference is that Defendant was forced to make difficult decisions when it reduced its workforce in November 2001." (Def.'s Mem.,[36] at 8; Def.'s Reply Mem., at 3, 5-7.)

In her brief, Plaintiff also points to the fact that Defendant demoted Sandra DiVito to a NSSC position, even though Defendant retained male NAEs Troy Overboe and Jeff Jarvis, whom Riesner had ranked lower than DiVito in his July 1, 2001 memo to Cronin. (Pl.'s Mem., at 9.) The sole female NAE that Defendant retained after the reorganization, McHugh, has no children. (Pl.'s 56.1 ¶¶ 37, 61, 104; Riesner Mem., at 5.)[37] Defendant does not address DiVito's demotion or McHugh's forced rankings in any of its submissions.

In the court's view, the sum of this evidence is greater than a mere "jumble" of "inappropriate but isolated comments." Some of the statements at issue certainly could be classified as mere "stray remarks," such as Riesner's alleged statement that Plaintiff "could take the ladies to get their nails done if [she] wanted," Cronin's comments that his wife had been "very happy during her pregnancy" during which she did not work, and Cronin's suggestion that Plaintiff

---

[36]     Defendant's Memorandum of Law in Support of Motion for Summary Judgment.

[37]     Plaintiff also implies that a reasonable jury could conclude that Lesley Moss, whom the record indicates was a mother, was demoted because of her sex. (Pl.'s Mem., at 6; Pl.'s 56.1 ¶ 61.) As noted earlier, however, Riesner indicated in his July 1, 2001 memo that he was "in the process of weeding out" Moss, as he had ranked her a "C." (Riesner Mem., at 2, 5.) As Plaintiff does not claim that Riesner's ranking of Lesley Moss in the "C" category (a ranking in which Plaintiff herself participated) was discriminatory, in the court's view this evidence does not support Plaintiff's claim.

29

might not be able to wait until he returned from traveling to talk with him. Other statements do, however, reflect stereotypical assumptions about pregnancy and childbirth that can have discriminatory effects. *See Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044-45 (7th Cir. 1999) ("A reasonable jury might conclude that a supervisor's statement to a woman known to be pregnant that she was being fired so that she could 'spend more time at home with her children' reflected unlawful motivations because it invoked widely understood stereotypes the meaning of which is hard to mistake"). As examples, the court notes Cronin's statement that it would not be fair to the company to give her a sales position or performance review until she returned from maternity leave, Cronin's remark that Plaintiff's views did not "really matter" as she was "not even going to be here" when the reorganization took effect due to her impending maternity leave, and Riesner's belief that sales was not available to Plaintiff based on her alleged inability to travel and restricted hours. Riesner's alleged statement to Plaintiff and a recruiter that Defendant would not hire women for its sales force "because they tend to get married and have babies" is similarly reflective of prejudice and stereotype. Finally, DiVito's unexplained demotion and McHugh's initial placement in an lower rank than her sales numbers indicated weigh in favor of Plaintiff's claims in this case.

A reasonable jury could find that the sum of these alleged comments and actions show that Riesner and Cronin denied Plaintiff eligibility to participate in Defendant's bonus plan, denied her a NAE position after she announced her pregnancy in May 2001, and terminated her because of her gender and pregnancy. The ultimate issue--whether the comments and behavior toward Plaintiff, McHugh, DiVito, and female applicants for sales positions show that Defendant's decisionmakers made decisions regarding Plaintiff on the basis of discriminatory animus--is for the factfinder to determine. *Cf. Maldonado*, 186 F.3d at 768 ("Whether [plaintiff's supervisor] or [plaintiff] provided a more credible version of events is a judgment for a factfinder to make. On summary judgment, though, we must resolve this dispute in favor of [plaintiff]"). Defendant's

30

motion for summary judgment as to Plaintiff's discrimination claim therefore must be denied.[38]

## III. Retaliation Claim

Plaintiff claims that Defendant retaliated against her "after she opposed and complained to [D]efendant and to the [EEOC] about . . . discriminatory treatment." (Compl. ¶ 1.) Title VII prohibits an employer from discriminating against an employee because she has opposed any practice made unlawful under the Act or because she "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the Act. 42 U.S.C. § 2000e-3(a). As with a sex or pregnancy discrimination charge, a plaintiff may pursue a retaliation charge and overcome a defendant's motion for summary judgment using either the direct method or the indirect method. *Wyninger v. New Venture Gear, Inc.*, No. 03-1632, – F.3d –, 2004 WL 541168, at *10 (7th Cir. Mar. 19, 2004). Under the direct method, the plaintiff must proffer direct evidence of (1) a statutorily-protected activity (such as alleging a violation of Title VII); (2) an adverse employment action; and (3) a causal connection between the two. *Lang v. Ill. Dep't Children and Family Servs.*, No. 03-2463, – F.3d –, 2004 WL 515621, at *2 (7th Cir. Mar. 17, 2004) (citing *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003); *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)); *but see Hermreiter v. Chicago Housing Auth.*, 315 F.3d 742, 745 (7th Cir. 2002) ("We do not mean to suggest by such citations that retaliation, to be actionable under Title VII (or other statutes), has to involve an adverse employment action. It does not"). As with a discrimination claim, under the direct method of proving retaliation, a plaintiff may rely either on direct evidence or circumstantial evidence that would allow a jury to infer

---

[38]     As Plaintiff has proffered sufficient evidence of "ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn," the court need not determine whether Defendant systematically treated similarly situated employees outside of the protected class more favorably, or whether Plaintiff was qualified for an open position but passed over in favor of a person not having the forbidden characteristic. *Venturelli*, 350 F.3d at 601. Additionally, the court need not examine whether Plaintiff has presented sufficient evidence under the indirect method of proof.

intentional discrimination. *Lang*, 2004 WL 515621, at *2 (citing *Rogers v. City of Chicago*, 320 F.3d 748, 753-54 (7th Cir.2003)); *but see Stone*, 281 F.3d at 644 ("The plaintiff in a retaliation case [has] two . . . distinct routes to obtaining/preventing summary judgment. . . . the one that is unrelated to *McDonnell Douglas*[] is to present direct evidence (*evidence that establishes without resort to inferences from circumstantial evidence* . . . .") (emphasis added).

Defendant implicitly acknowledges that Plaintiff's complaints to Defendant, to the EEOC, and to the IDHR were statutorily-protected activities. Plaintiff claims that the adverse employment actions visited upon her included divestment of her management responsibility over the three NAEs, assignment to administrative tasks, exclusion from meetings and projects affecting national account sales, and termination. (Compl. ¶¶ 20, 23.) Defendant does not dispute that these were adverse employment actions. Indeed, in retaliation claims, courts "often take a more generous view of what events constitute actionable claims" than in discrimination claims. *Volovsek*, 344 F.3d at 688 n.5. Defendant contends, however, that Plaintiff cannot establish a causal link between her statutorily-protected speech and those adverse employment actions.

Plaintiff implicitly points to the short lapse of time between her complaints to Riesner about the golf outings, employee rankings, and Defendant's "general treatment of women employees" on the one hand, and the fact that Riesner allegedly no longer included her in the rankings process and ceased trying to persuade Cronin to give her a sales position and title, on the other. (Pl.'s 56.1 ¶ 89.) Plaintiff also urges that Cronin and Riesner must have known about Plaintiff's attorney's letter and her EEOC/IDHR charges before her termination and that those documents influenced their decision to terminate her. (Pl.'s Mem., at 12.) Plaintiff notes that her attorney sent a copy of the October 18, 2001 letter to Linda Pilar, Defendant's Chicago office Human Resources Manager, and that a copy of the letter was faxed to Defendant's Chicago office on October 22, 2001. (Pl.'s 56.1 ¶¶ 66, 96.) As described earlier, Pilar testified that she discussed Plaintiff's EEOC complaint with Cronin and Riesner at some point after reviewing it, and that she could not recall when "we

32

received" Plaintiff's EEOC complaint, although she believed it was in late November or early December 2001. (Pilar Dep., at 66-69, 71-73; Pilar Aff. ¶¶ 1-2.) Plaintiff has proffered no evidence that Riesner or Cronin actually saw her attorney's letter or her EEOC/IDHR charges before her termination, however, and it is unclear from Pilar's testimony when she reviewed and discussed the charges with Riesner and Cronin.

Defendant points to evidence it claims shows there was no causal link between any of Plaintiff's complaints and Defendant's decisions. First, Plaintiff had been asking for a new position since February 2001, before she complained to Riesner about his golf outings and McHugh's ranking. Second, as noted earlier, Cronin and Riesner urge that they had not seen the October 18 letter penned by Plaintiff's attorney and had not been aware of any of Plaintiff's EEOC/IDHR charges prior to her termination. (Def.'s 56.1 ¶ 66.) Third, on November 14, 2001, the date Plaintiff was terminated, Riesner told Plaintiff that he was not aware that she had filed charges with the EEOC. (Def.'s 56.1 ¶ 43.) Defendant thus claims there is no causal link between Plaintiff's complaints and the adverse actions she experienced. (Def.'s Mem., at 12; Def.'s Reply Mem., at 10-11.)

Even construing all inferences in favor of Plaintiff, the court concludes that there is not sufficient evidence of a causal connection linking Plaintiff's complaints alleging sex and pregnancy discrimination and the adverse employment actions she suffered. Plaintiff has proffered no evidence aside from temporal proximity between her statutorily-protected statements and Defendant's actions. A short period of time between the filing of a charge of discrimination and an allegedly retaliatory action, although "often an important evidentiary ally of the plaintiff," is rarely enough by itself to create a triable issue. *Lang*, 2004 WL 515621, at *3 (internal quotation marks and citations omitted). "Close temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment provided that there is also other evidence that supports the inference of a causal link." *Id.* (internal quotation marks and citations omitted). As Plaintiff has

33

proffered no evidence of retaliation aside from temporal proximity, her retaliation claim fails under the direct method of proof.

Nor can Plaintiff prevail under the indirect method. Under the indirect method, the plaintiff must show that she (1) engaged in a statutorily-protected activity; (2) is qualified for the position, or, if already employed, has performed her job to her employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in statutorily-protected activity. *Rhodes*, 359 F.3d at 508.[39] If the plaintiff establishes these elements, the burden of production shifts to the defendant to proffer a legitimate, non-invidious reason for its adverse action. *Id.* If the defendant carries this burden, the burden remains with the plaintiff to present evidence that the defendant's reason is pretextual. *Id.*

Although Defendant does not challenge Plaintiff's qualifications or her job performance, Defendant contends she cannot show that any similarly situated employees were treated more favorably. A "similarly situated" individual is one who is "directly comparable to [the employee] in all material respects." *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 531-32 (7th Cir. 2003) (citation omitted). To determine whether Plaintiff and another employee are directly comparable, the court must look at all relevant factors, "which most often include whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Id.* (citation omitted).

Plaintiff argues that she was similarly situated to four male NAEs who retained their positions after the RIF, Jarvis, Olszak, D'Angelo, and Overboe, (Pl.'s Mem., at 9-10); Defendant

---

[39]     Defendant claims that, under the indirect method of establishing a prima facie claim of retaliation, Plaintiff must show (1) a statutorily protected expression, (2) an adverse action, and (3) a causal link between the two. (Def.'s Mem., at 7.) The case Defendant cites, however, *Dey v. Colt Construction & Development Co.*, 28 F.3d 1446, 1457 (7th Cir. 1994), predates *Stone*, in which our Court of Appeals stated that a plaintiff proceeding under the indirect method "need not show even an attenuated causal link." 281 F.3d at 644.

denies this contention. (Def.'s Mem., at 9-10; Def.'s Reply Mem., at 8.) Plaintiff testified that she shared the same supervisor, Riesner, with Jarvis, D'Angelo, and Overboe prior to Riesner's move to the Hotel Division on approximately October 31, 2001.[40] (Stern Dep., at 171-73.) Plaintiff presents no evidence, however, that after February 2001, she and these NAEs held the same job description, were subject to the same standards, and had comparable experience, education, and other qualifications. As noted above, although NAEs were responsible for sales accounts in a particular region of the country,[41] and Plaintiff initially retained such responsibility after her promotion, there is no evidence that, after February 2001, she retained any sales responsibilities.[42]

Defendant contends that only one employee, Debbie Zwartz, might be considered similarly situated to Plaintiff. (Def.'s Mem., at 10.) Defendant notes that Zwartz was pregnant when Defendant promoted her to the same position and title as Plaintiff and was retained after the RIF. (Def.'s 56.1 ¶¶ 16, 62.) Plaintiff claims that she and Zwartz were not similarly situated because "their duties were quite different and [Plaintiff] repeatedly requested to be given a different title that

---

[40]    As noted earlier, Plaintiff was Olszak's supervisor until approximately October 31, 2001, after which Olszak began reporting to Phil Schneider. (Pl.'s 56.1 ¶ 36.) Further, on approximately October 31, 2001, Riesner told Plaintiff that he had been reassigned to head the NAS Division's Hotel Division, with Jarvis reporting to him. (Def.'s 56.1 ¶¶ 31-32, 35; Pl.'s 56.1 ¶ 97.) The record does not indicate to whom D'Angelo and Overboe reported after Riesner was moved to the Hotel Division.

[41]    The record also indicates that, prior to Plaintiff's June 2000 promotion, NAEs also had some responsibility for managing NSSCs; however, Plaintiff acknowledges that, with her promotion to Manager of National Account Services in June 2000, she began supervising the NSSCs. (Stern Dep., at 19, 43.) The court infers that, after June 2000, NAEs no longer had any responsibility for managing the NSSCs.

[42]    Plaintiff also contends that she is similarly situated to Jarvis, Olszak, D'Angelo, and Overboe because she "had been requesting to have . . . a sales title restored to her for months in order to enhance her job security [and] because . . . by any objective criteria, she was demonstrably better qualified than those four salesmen." (Pl.'s Mem., at 9-10.) As noted earlier, there is no evidence to suggest that Plaintiff was better qualified than these four employees. In any event, Plaintiff cites no support for her contention that a plaintiff is similarly situated to employees who hold a position that the plaintiff desires merely because the plaintiff is better qualified for that position.

35

made it clear that [her] main job responsibilities were in sales, not sales support." (Pl.'s Mem., at 11.) Plaintiff also states that Zwartz had no sales responsibilities, "so she was never in a position to be the target of Defendant's animus against saleswomen with children." (*Id.*) Apart from supervising the NSSCs, however, the record does not indicate what Zwartz's duties were. Nor is it clear whether Zwartz reported to Riesner, as Plaintiff did. In the court's view, it is not possible therefore to determine whether Plaintiff and Zwartz were similarly situated.

Viewing the facts in the light most favorable to Plaintiff, there appear to be no similarly situated employees to Plaintiff at all. Because Plaintiff can point to no similarly situated employees, she cannot establish a prima facie case of retaliation under the indirect method. *Cf. Durkin v. City of Chicago*, 341 F.3d 606, 613 (7th Cir. 2003) (plaintiff "cannot meet her burden by pointing to an absence of *any* similarly situated male[s]") (internal quotation marks and citation omitted). Defendant's motion for summary judgment as to Plaintiff's retaliation claim therefore must be granted.

## CONCLUSION

Plaintiff Stacey Stern has presented sufficient direct circumstantial evidence to create genuine issues of material fact regarding her sex and pregnancy discrimination claims to defeat Defendant Cintas's motion for summary judgment. Stern has not presented sufficient evidence to establish a prima facie case of retaliation. Therefore, for the reasons stated above, Cintas's Motion for Summary Judgment (Doc. No. 16-1) is granted as to Plaintiff's retaliation claim and denied as to Plaintiff's sex and pregnancy discrimination claims.

ENTER:

Dated: March 23, 2003

REBECCA R. PALLMEYER
United States District Judge